IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

DONALD EUELL                    )
    Plaintiff,                  )
                                )
        v.                    )        Civil No.  3:13cv727 (HEH)
                                )
CAROLYN W. COLVIN,              )
    Acting Commissioner of Social )
    Security,                   )
    Defendant.                  )
                                )

## REPORT AND RECOMMENDATION

Donald Euell ("Plaintiff") is sixty-six years old and previously worked as a school bus

driver.  On May 14, 2010, Plaintiff protectively filed for Disability Insurance Benefits ("DIB")

under the Social Security Act ("Act"), alleging disability from insulin-dependent diabetes and

diabetic retinopathy/glaucoma of the right eye with loss of field vision, with an alleged original

onset date of December 11, 2009.  Plaintiff's claims were denied both initially and upon

reconsideration.  An Administrative Law Judge ("ALJ") held a hearing on June 26, 2012, during

which Plaintiff amended his alleged onset date to July 14, 2010.  The ALJ subsequently denied

Plaintiff's request for benefits on June 29, 2012.  The Appeals Council denied Plaintiff's request

for review on August 30, 2013, rendering the ALJ's decision the final decision of the

Commissioner.

Plaintiff seeks judicial review of the ALJ's decision in this Court pursuant to 42 U.S.C.

§ 405(g).  Plaintiff challenges the ALJ's denial of benefits on the basis that the ALJ incorrectly

applied the Medical-Vocational Guidelines ("Grids") to determine whether Plaintiff could

perform work that existed in the national economy. (Pl.'s Mem. in Supp. of Mot. for Summ. J. ("Pl.'s Mem.") (ECF No. 12) at 7-11.)

The matter comes before the Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) on the parties' cross-motions for summary judgment.[1] For the reasons set forth below, the Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 11) be DENIED, that Defendant's Motion for Summary Judgment (ECF No. 13) be GRANTED and that the final decision of the Commissioner be AFFIRMED.

## I.    BACKGROUND

Because Plaintiff challenges the ALJ's decision, Plaintiff's education and work history, medical history and relevant hearing testimony are summarized below.

### A.  Plaintiff's Education and Work History

Plaintiff has a high school diploma. (R. at 183.) Plaintiff worked for thirty-five years as a school bus driver in the transportation industry. (R. at 184.) Plaintiff also worked a second job for thirteen years as a correctional officer. (R. at 184.) Plaintiff left his job as a school bus driver when he became insulin-dependent, because Fairfax County Public Schools would no longer allow him to drive a school bus. (R. at 39.) Since being unemployed, Plaintiff has not looked for other employment and has not considered other work that he could do. (R. at 46.)

### B.  Plaintiff's Medical History

Plaintiff visited Arash Mansouri, M.D. in 2005 and 2006 for eye appointments and was diagnosed with open angle glaucoma that was more severe in his right eye. (R. at 331-34.) On

---

[1]    The administrative record in this case has been filed under seal, pursuant to E.D. Va. Loc. R. 5 and 7(C). In accordance with these Rules, the court will endeavor to exclude any personal identifiers such as Plaintiff's social security number, the names of any minor children, dates of birth (except for year of birth), and any financial account numbers, from its consideration of Plaintiff's arguments and will further restrict its discussion of Plaintiff's medical information to only the extent necessary to properly analyze the case.

December 3, 2007, Dr. Mansouri observed that Plaintiff's intraocular pressure and cataracts were stable. (R. at 329.) On June 30, 2008, Dr. Mansouri determined that Plaintiff's intraocular pressure was acceptable. (R. at 323.) Dr. Mansouri also checked Plaintiff's left and right eyes and observed that both eyes showed normal anatomy, were quiet, clear and deep, and that Plaintiff had resection and recession without neovascularization of the iris. (R. at 323.)

On February 25, 2009, Plaintiff visited Leslie Gondor, M.D., a family medicine practitioner, for his history of diabetes and hypertension. (R. at 230.) Dr. Gondor diagnosed Plaintiff with hypertension, hyperglycemia and non-insulin dependent diabetes mellitus. (R. at 230.) Dr. Gondor advised Plaintiff to take several medications to control Plaintiff's high blood pressure, including HCTZ, verapamil and lisinopril. (R. at 230.) On March 4, 2009, Dr. Gondor noted that Plaintiff's diabetes improved on Levitra. (R. at 228.)

On September 4, 2009, Dr. Mansouri observed that Plaintiff's right and left eyes showed normal anatomy, were quiet, clear and deep, and that Plaintiff had resection and recession without neovascularization of the iris. (R. at 321.) Dr. Mansouri also determined that Plaintiff had "acceptable" intraocular pressure. (R. at 321.) On January 13, 2010, Dr. Gondor certified that Plaintiff was unable to work from January 13, 2010, through January 15, 2010, due to his diabetes mellitus, but that Plaintiff could return to work on January 16, 2010. (R. at 221.) On January 18, 2010, Dr. Gondor again certified that Plaintiff was unable to work from January 18, 2010, through January 20, 2010, due to his diabetic condition, but that Plaintiff could return to work on January 21, 2010. (R. at 214.) On January 18, 2010, Dr. Mansouri also noted that Plaintiff's right eye was "stable" after taking Avastin. (R. at 320.)

On January 21, 2010, Plaintiff visited Brenda M. Armenti-Kapros, M.D., an endocrinologist, who tested Plaintiff's Hemoglobin A1c ("HgA1c") to determine Plaintiff's

3

average blood sugar level and how well Plaintiff controlled his diabetes. (R. at 257.) Initially, Plaintiff's HgA1c was 10.7%, which indicated that Plaintiff had high blood sugar.[2] (R. at 257.) Dr. Armenti-Kapros noted that Plaintiff's HgA1c reading indicated that Plaintiff suffered from atypical diabetes mellitus. (R. at 281.) On January 25, 2010, Plaintiff visited Dr. Gondor, who recommended that Plaintiff participate in the "Core Diabetes Education Program," a group class to instruct individuals with diabetes about health management. (R. at 243.) On February 23, 2010, Dr. Armenti-Kapros observed that Plaintiff's blood sugar had already improved. (R. at 272.)

In March 2010, Dr. Mansouri noted that Plaintiff was doing well and that Plaintiff's right eye was "good today." (R. at 314, 316, 318.) Dr. Mansouri also observed that Plaintiff's right and left eyes showed normal anatomy, were quiet, clear and deep, and that Plaintiff had resection and recession without neovascularization of the iris. (R. at 314.) Plaintiff complained of decreased vision in his right eye and visited A.R. Tabassian, M.D., an ophthalmologist with the Retina Institute of Virginia, for further ophthalmology examinations. (R. at 300.) On April 9, 2010, Dr. Tabassian performed several tests on Plaintiff's eyes to determine their acuity and to determine a diagnosis. (R. at 301-05.) Initially, Dr. Tabassian observed that Plaintiff had defects in all fields in his right eye. (R. at 301.) Plaintiff's left eye, however, had no defects and a visual acuity of 20/20. (R. at 301.) A fundus examination showed that Plaintiff's right eye had hemorrhaged, but that no problems existed in the left eye. (R. at 304.) The slit lamp examination showed that Plaintiff was normal in all areas for both eyes. (R. at 304.) Dr. Tabassian ultimately diagnosed Plaintiff with vitreous hemorrhage, proliferative diabetic

---

[2]      Medical records indicated that HgA1c percentages within the range of 5.7% through 6.4% suggested individuals with an increased risk for diabetes; HgA1c percentages greater than 6.4% suggested individuals with diabetes; and HgA1c percentages less than 7.0% for adults with diabetes suggested glycemic control. (R. at 252.)

retinopathy, pseudophakia and primary open angle glaucoma in the right eye, and proliferative

diabetic retinopathy, pseudophakia and primary open angle glaucoma in the left eye. (R. at 305.)

On April 16, 2010, Dr. Tabassian observed that Plaintiff's right eye visual acuity was 20/100-1

with the use of a pinhole, but that Plaintiff's left eye visual acuity remained at 20/20. (R. at 297.)

Dr. Tabassian again diagnosed Plaintiff with vitreous hemorrhage in the right eye and

proliferative diabetic retinopathy, pseudophakia and primary open angle glaucoma in both eyes.

(R. at 298.)

On April 20, 2010, Dr. Armenti-Kapros documented Plaintiff's HgA1c level at 6.3% and

on April 22, 2010, indicated that Plaintiff's HgA1c level was "excellent." (R. at 254, 270.) On

May 14, 2010, Plaintiff reported to Dr. Tabassian that the vision in his right eye was slightly

better. (R. at 291.) Dr. Tabassian continued to observe that Plaintiff's right eye slowly

improved. (R. at 291.) Plaintiff's visual acuity examination confirmed improvement, showing

that Plaintiff's right eye had improved to 20/50-1 while Plaintiff's left eye remained at 20/20-1.

(R. at 292.) On July 13, 2010, Dr. Armenti-Kapros tested Plaintiff's HgA1c level at 6.0%. (R. at

252.) Dr. Armenti-Kapros noted the steady improvement in Plaintiff's medical chart and opined

that Plaintiff's HgA1c level was "awesome" and "at [the] goal."[3] (R. at 267-68.)

On August 6, 2010, Dr. Tabassian opined that Plaintiff's right eye was doing well, that

the vitreous hemorrhage had settled, that the neovascularization had regressed and that Plaintiff's

non-proliferative diabetic retinopathy was doing well in the left eye. (R. at 290.) Dr. Tabassian

described Plaintiff's chronic open angle glaucoma as advanced in the right eye, but noted that the

---

[3]     Dr. Armenti-Kapros listed Plaintiff's previous HgA1c test results:  Plaintiff's HgA1c
level was 10.7% on January 21, 2010, 6.3% on April 20, 2010, and 6.0% on July 13, 2010. (R.
at 268.)

intraocular pressure was fine. (R. at 290.) Similarly, on August 11, 2010, Dr. Mansouri found that Plaintiff's hemiretinal vein occlusion in the right eye remained stable. (R. at 311.)

On October 12, 2010, Dr. Armenti-Kapros recorded Plaintiff's HgA1c level at 6.0%, describing it as "excellent." (R. at 352.) Significantly, Dr. Armenti-Kapros noted that Plaintiff's HgA1c level remained the same since July 13, 2010. (R. at 352.) On January 7, 2011, Plaintiff's HgA1c level remained stable at 6.1%. (R. at 358.) On February 4, 2011, Dr. Tabassian determined that Plaintiff suffered from primary open angle glaucoma in both eyes, but described Plaintiff's retinopathy as "okay." (R. at 373, 375.) On February 7, 2011, Plaintiff visited Dr. Mansouri, who observed that both of Plaintiff's eyes showed normal anatomy, were quiet, clear and deep, and that Plaintiff had resection and recession without neovascularization of the iris. (R. at 381.) Dr. Mansouri also noted that Plaintiff's open angle glaucoma and intraocular pressure were doing better. (R. at 381.) The following week, Dr. Mansouri observed that Plaintiff's open angle glaucoma and intraocular pressure were acceptable. (R. at 378.) In April 2011, Dr. Mansouri noted that Plaintiff's open angle glaucoma and intraocular pressure remained unchanged. (R. at 377.)

On May 11, 2011, Dr. Armenti-Kapros recorded Plaintiff's HgA1c level at 6.1%. (R. at 417.) The following month, Dr. Mansouri observed that Plaintiff's open angle glaucoma and intraocular pressure were acceptable and instructed Plaintiff to continue his medication. (R. at 400.) In August 2011, Plaintiff returned to Dr. Tabassian and complained of decreased vision in his right eye as a result of his diabetes. (R. at 390.) Dr. Tabassian reviewed Plaintiff's medical history and performed several eye examinations that yielded largely normal results. (R. at 394-95.) Dr. Tabassian described Plaintiff's retinopathy as "stable" and opined that Plaintiff's right eye was "doing well." (R. 395-96.) In August 2011, Dr. Mansouri described Plaintiff's

intraocular pressure as acceptable and noted that his examination results remained unchanged. (R. at 397-99). That same month, Dr. Armenti-Kapros opined that Plaintiff's HgA1c level was "good." (R. at 410.)

On January 8, 2012, Plaintiff experienced high blood sugar for approximately one week. (R. at 405.) On January 10, 2012, Dr. Armenti-Kapros described Plaintiff's blood sugar as "unreadable," but indicated that it remained high and discussed needing emergency medical attention because of the severity of Plaintiff's status. (R. at 409.) Plaintiff was then admitted to the hospital for high blood sugar and nausea. (R. at 420-35.) While in the hospital, Plaintiff's examinations consistently showed that he was alert, well-oriented and well-nourished, his conjunctivae were normal, his pupils were equal, round and reactive, his cardiovascular, pulmonary and musculoskeletal systems were normal, and he exhibited normal mood, affect, behavior and thought content. (R. at 422, 424, 427, 430, 433, 435.) Plaintiff was discharged on January 12, 2012, and instructed to increase his insulin. (R. at 422, 425, 428, 431, 433.)

On June 12, 2012, Dr. Mansouri opined in a letter that Plaintiff's primary problem was his limited field of vision in his right eye, but that his eyes were doing well. (R. at 446.) Plaintiff's acuity in both eyes were "fine," but Dr. Mansouri described Plaintiff as "pretty much a one-eyed man" because of his limited field of vision. (R. at 446-47.) Dr. Mansouri also noted that Plaintiff's field of vision would not directly impact his hand-eye coordination, handling small objects or walking on uneven surfaces so long as Plaintiff can check where he walks, but that "very, very" fine inspection work would be difficult to complete. (R. at 447.) Dr. Mansouri noted that Plaintiff's most important consideration was his awareness to see dangerous or moving machinery as a result of his decreased field of vision. (R. at 447.)

On June 12, 2012, Dr. Mansouri wrote a letter to Plaintiff's counsel and opined that Plaintiff had a limited field of vision in his right eye, but that both eyes showed reasonably good acuity. (R. at 446.) Plaintiff's left eye repeatedly registered at 20/20 and his right eye fluctuated between 20/30 to 20/60-70, but registered at 20/50 in August 2011. (R. at 446.) Dr. Mansouri noted that Plaintiff saw "fairly clearly through an extremely limited field of vision that he ha[d] in his right eye." (R. at 446.) Dr. Mansouri further opined that Plaintiff functioned like a one-eyed man because of his limited field of vision and, therefore, would be excluded from driving a school bus or holding a CDL. (R. at 446.) Dr. Mansouri noted that Plaintiff's vision would not impact his depth perception, hand-eye coordination or handling objects, but Plaintiff would have difficulty completing "[v]ery, very fine/close inspection work." (R. at 447.) Lastly, Dr. Mansouri explained that Plaintiff should not work in an environment with moving machinery or dangerous hazards. (R. at 447.)

C. Plaintiff's Testimony

On June 26, 2012, Plaintiff, represented by counsel, testified at the hearing before the ALJ. (R. at 35-47.) Plaintiff had insulin-dependent diabetes, diabetic retinopathy and glaucoma. (R. at 35.) Plaintiff's glaucoma caused him to have a restricted field of vision and limited peripheral vision, but he continued to have good visual acuity in both eyes. (R. at 38.) Plaintiff used drops to manage his glaucoma. (R. at 37.) Plaintiff had worked as a bus driver for the Fairfax County school district since 1974, but he stopped because, he became insulin-dependent and Fairfax County would no longer allow him to drive a school bus. (R. at 37-39.)

Plaintiff testified that he was first diagnosed with diabetes several years earlier and became insulin-dependent in July 2010.[4] (R. at 40, 52.) He used around four insulin shots each day. (R. at 40.) Plaintiff stated that he routinely checked his blood sugar when he woke up and his levels varied, but were sometimes around 200. (R. at 40.) Plaintiff would then give himself an insulin shot after breakfast, wait a few hours and then re-check his blood sugar. (R. at 41.) Plaintiff testified that his second blood sugar reading was usually around 120. (R. at 41.)

Plaintiff still drove a car, but tried to stay on routes that he was most familiar with and avoided driving at night. (R. at 41-42.) Plaintiff typically drove to his congregation meetings, approximately fifteen miles away. (R. at 42.) Plaintiff wore glasses and reported that he could see and read better with them. (R. at 43.) Even with glasses, Plaintiff still experienced trouble with his right peripheral vision, but he could still read. (R. at 43.) Plaintiff described being generally more careful, especially with keeping his equilibrium while he walked. (R. at 44-45.) He testified that he walked slowly on steps and curbs, but that he did not have a problem knowing where his foot was in relation to the brake or gas pedal in the car. (R. at 44-45.) Plaintiff indicated that he had not looked for a new job, because he did not know what other work that he could do. (R. at 46.)

D. Vocational Expert Testimony

During the June 26, 2012 hearing, a vocational expert ("VE") also testified. (R. at 47-70.) After reviewing Plaintiff's vocational history, the VE testified that Plaintiff could not perform his past relevant work as a school bus driver, because his insulin dependence prevented

---

Plaintiff initially testified that he first became insulin-dependent in December 2009. (R. at 52.) Plaintiff's counsel later corrected Plaintiff's statement and noted that Plaintiff first became insulin-dependent on July 14, 2010, when he began to see Hanover Endocrinology. (R. at 53.) Plaintiff's counsel also amended Plaintiff's alleged disability onset date to July 14, 2010. (R. at 53.)

him from holding a CDL. (R. at 51-52.) The VE also testified that Plaintiff had no transferable skills. (R. at 52.)

The ALJ asked the VE to consider an individual with the same age, education and work experience as Plaintiff, who had the ability to perform medium exertional work, was blind in the right eye and who could not work around dangerous machinery or heights. (R. at 48-49.) The VE opined that the individual could not perform Plaintiff's past work because of the impaired field of vision. (R. at 48-49.) The ALJ then asked the VE whether that same individual could work as a school bus driver if he still had a limited field of vision, but could see 160 degrees straight ahead. (R. at 49.) The VE opined that such an individual could not work as a school bus driver and likely could not work driving any vehicle commercially with an impaired field of vision because of the associated risk factors. (R. at 49.)

The ALJ then posed a new hypothetical to the VE based on Dr. Mansouri's letter. (R. at 53-56, 446-47.) The ALJ inquired about an individual who was restricted to a work environment that avoided dangerous machinery, heights or "very, very fine" inspection work, with limited vision out of his right eye, but retained visual acuity of 20/50 in a limited field of vision. (R. at 59, 446-47.) The VE opined that the individual could work a number of medium exertional level jobs, including as a housekeeper in a private home, with 70,000 jobs nationally and 400 jobs in Virginia; as a counter-supply worker, with 80,000 jobs nationally and 1,100 jobs in Virginia; and, as a hand packager with 45,000 jobs nationally and 750 jobs in Virginia. (R. at 59-60, 67-68.)

## II.   PROCEDURAL HISTORY

On May 14, 2010, Plaintiff protectively filed an application for DIB alleging disability beginning December 11, 2009, for insulin-dependent diabetes and diabetic retinopathy/glaucoma

of the right eye. (R. at 157.) Plaintiff formally filed an application for DIB on September 3, 2010. (R. at 149-55.) Plaintiff's claim was denied both initially and again upon reconsideration. (R. at 88-90, 93-95.) Plaintiff filed a written request for a hearing on July 15, 2011, and appeared with counsel before an ALJ on June 26, 2012. (R. at 35-47, 101-02.) On June 29, 2012, the ALJ issued a written opinion finding Plaintiff not disabled under the Act. (R. at 18-20.) On August 30, 2013, the Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner subject to judicial review by this Court. (R. at 1-3.)

### III.    QUESTION PRESENTED

1.  Did the ALJ err in Plaintiff's RFC determination?

2.  Did the ALJ err in determining that Plaintiff could perform work that existed in the national economy, based on application of the Medical-Vocational Guidelines?

### IV.    STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, the Court is limited to determining whether substantial evidence in the record supports the Commissioner's decision and whether the proper legal standards were applied in evaluating the evidence. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (citing *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005)). Substantial evidence is more than a scintilla, is less than a preponderance and is the kind of relevant evidence that a reasonable mind could accept as adequate to support a conclusion. *Hancock*, 667 F.3d at 472; *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996).

To determine whether substantial evidence exists, the Court must examine the record as a whole, but may not "'undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ].'" *Hancock*, 667 F.3d at 472

11

(quoting *Johnson*, 434 F.3d at 653). In considering the decision of the Commissioner based on the record as a whole, the Court must "'take into account whatever in the record fairly detracts from its weight.'" *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951)). The Commissioner's findings as to any fact, if substantial evidence in the record supports the findings, are conclusive and must be affirmed regardless of whether the reviewing court disagrees with such findings. *Hancock*, 667 F.3d at 477. If substantial evidence in the record does not support the ALJ's determination or if the ALJ has made an error of law, the Court must reverse the decision. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A sequential evaluation of a claimant's work and medical history is required to determine if a claimant is eligible for benefits. 20 C.F.R. §§ 404.1520, 416.920; *Mastro v. Apfel*, 270 F.3d 171, 177 (4th Cir. 2000). An ALJ conducts the analysis for the Commissioner, and it is that process that a court must examine on appeal to determine whether the correct legal standards were applied, and whether substantial evidence in the record supports the resulting decision of the Commissioner. *Mastro*, 270 F.3d at 176-77.

The first step in the sequence is to determine whether the claimant was working at the time of the application and, if so, whether the work constituted "substantial gainful activity" ("SGA"). 20 C.F.R. §§ 404.1520(b), 416.920(b). SGA is work that is both substantial and gainful as defined by the Agency in the C.F.R. Substantial work activity is "work activity that involves doing significant physical or mental activities. Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before." 20 C.F.R. § 404.1572(a). Gainful work activity is work activity done for "pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b). Taking care of

12

oneself, performing household tasks or hobbies, therapy or school attendance, and the like, are not generally considered substantial gainful activities. 20 C.F.R. § 404.1572(c). If a claimant's work constitutes SGA, the analysis ends and the claimant must be found "not disabled," regardless of any medical condition. *Id.*

If the claimant establishes that he did not engage in SGA, the second step of the analysis requires him to prove that he has "a severe impairment . . . or combination of impairments which significantly limit[s] [his] physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(c); *see also* 20 C.F.R. § 404.1520(c). To qualify as a severe impairment that entitles one to benefits under the Act, it must cause more than a minimal effect on one's ability to function. 20 C.F.R. § 404.1520(c).

At the third step, if the claimant has an impairment that meets or equals an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (listing of impairments) and lasts, or is expected to last, for twelve months or result in death, it constitutes a qualifying impairment and the analysis ends. 20 C.F.R. §§ 404.1520(d), 416.920(d). If the impairment does not meet or equal a listed impairment, then the evaluation proceeds to the fourth step in which the ALJ must determine whether the claimant can return to his past relevant work[5] based on an assessment of the claimant's RFC[6] and the "physical and mental demands of work [the claimant] has done in

---

[5]    Past relevant work is defined as SGA in the past fifteen years that lasted long enough for an individual to learn the basic job functions involved. 20 C.F.R. §§ 404.1565(a), 416.965(a).

[6]    RFC is defined as "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-80. When assessing the RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (*i.e.*, eight hours a day, five days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. *Id.* (footnote omitted).

the past." 20 C.F.R. §§ 404.1520(e), 416.920(e). If such work can be performed, then benefits will not be awarded. *Id.* The burden of proof remains with the claimant through step four of the analysis, such that he must prove that his limitations preclude him from performing his past relevant work. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Hancock*, 667 F.3d at 472.

However, if the claimant cannot perform his past work, the burden then shifts to the Commissioner at the fifth step to show that, considering the claimant's age, education, work experience and RFC, the claimant is capable of performing other work that is available in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(f), 416.920(f); *Powers v. Apfel*, 207 F.3d 431, 436 (7th Cir. 2000) (citing *Yuckert*, 482 U.S. at 146 n.5). The Commissioner can carry her burden in the final step with the testimony of a VE. When a VE is called to testify, the ALJ's function is to pose hypothetical questions that accurately represent the claimant's RFC based on all evidence on record and a fair description of all of the claimant's impairments, so that the VE can offer testimony about any jobs existing in the national economy that the claimant can perform. *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). Only when the hypothetical posed represents all of the claimant's substantiated impairments will the testimony of the VE be "relevant or helpful." *Id.* If the ALJ finds that the claimant is not capable of SGA, then the claimant is found to be disabled and is accordingly entitled to benefits. 20 C.F.R. §§ 404.1520(f)(1), 416.920(f)(1).

V.   ANALYSIS

A. The ALJ's Decision.

On June 26, 2012, the ALJ held a hearing during which Plaintiff, represented by counsel, and a VE testified. (R. at 35-47.) On June 29, 2012, the ALJ issued a written decision finding that Plaintiff was not disabled under the Act. (R. at 21-28.)

14

At step one, the ALJ determined that Plaintiff had not engaged in SGA since his amended alleged onset date of July 14, 2010.  (R. at 23.)  At step two, the ALJ determined that Plaintiff had the severe impairments of insulin-dependent diabetes mellitus and diabetic retinopathy/glaucoma of the right eye.  (R. at 23.)  The ALJ further determined that the impairments did not meet the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. at 24.)  At step three, the ALJ determined that Plaintiff had the RFC to perform medium work, but was limited to work that could be performed with no stereoscopic vision in the right eye, no exposure to dangerous machinery and heights, and no "very, very fine" inspection tasks.  (R. at 24-25.)  At step four, the ALJ concluded that Plaintiff could not perform his past relevant work as a school bus driver.  (R. at 26.)  Finally, at step five, based upon Plaintiff's age, education, work experience and RFC, the ALJ determined that jobs existed in the national economy in significant numbers that Plaintiff could perform.  (R. at 26-27.)

Plaintiff now challenges the ALJ's decision, arguing that the ALJ erred in referencing the Grid Rules applicable to medium work, because Plaintiff's nonexertional limitations significantly reduced the number of jobs that he could perform at the medium exertional level.  (Pl.'s Mem. at 7-11.)  Defendant responds that substantial evidence supports the ALJ's decision that Plaintiff could perform other work that existed in the national economy.  (Def.'s Mem. for Summ. J. and Br. in Supp. ("Def.'s Mem.") (ECF No. 13) at 9-14.)

B. The ALJ did not err in determining Plaintiff's RFC.

Plaintiff argues that the ALJ's determination that Plaintiff had the RFC to perform medium work, but was limited to work that could be performed with no stereoscopic vision in the right eye, eroded the number of available jobs such that those jobs did not exist in significant numbers in the national or local economies.  (Pl.'s Mem. at 10-11.)  Specifically, Plaintiff argues

that his nonexertional limitations diminished the occupational base to the extent that Plaintiff

should be found disabled.[7]   (Pl.'s Mem. at 10-11.)  Defendant maintains that substantial evidence

supports the ALJ's decision that Plaintiff could perform other work that existed in significant

numbers.  (Def.'s Mem. at 9-12.)

After step three of the ALJ's sequential analysis, but before deciding whether a claimant

can perform past relevant work at step four, the ALJ must determine the claimant's RFC.  20

C.F.R. §§ 416.20(e)-(f), 416.945(a)(1).  In analyzing a claimant's abilities, an ALJ will first

assess the nature and extent of the claimant's physical limitations and then determine the

claimant's RFC for work activity on a regular and continuing basis.  20 C.F.R. § 404.1545(b).

Generally, it is the responsibility of the claimant to provide the evidence that the ALJ utilizes in

making the RFC determination; however, before a determination is made that a claimant is not

disabled, the ALJ must develop the claimant's complete medical history, including scheduling

consultative examinations if necessary.  20 C.F.R. § 404.1545(a)(3).  The RFC must incorporate

impairments supported by the objective medical evidence in the record and those impairments

that are based on the claimant's credible complaints.  20 C.F.R. § 404.1545.

After considering all of Plaintiff's physical and mental impairments, the ALJ found that

Plaintiff had the RFC to perform work at the medium exertional level, but was limited to work

that could be performed with no stereoscopic vision in the right eye, which required neither

exposure to dangerous machinery or heights, nor "very, very fine" inspection tasks.  (R. at 24.)

Substantial evidence supports the ALJ's determination.

---

[7]      Plaintiff does not contest the ALJ's determinations that Plaintiff could perform medium
exertional work.  Plaintiff admits that he could perform certain jobs at the medium exertional
level.  (Pl.'s Mem. at 10.)

Substantial evidence supports the ALJ's determination regarding Plaintiff's nonexertional limitations on the basis of medical evidence. On September 4, 2009, Dr. Mansouri observed that Plaintiff's intraocular pressure was "acceptable." (R. at 321.) Plaintiff returned to Dr. Mansouri's office on January 18, 2010, when his right eye continued to be "stable." (R. at 320.) In January 2010, Plaintiff also began to visit Dr. Armenti-Kapros, who initially determined that Plaintiff's HgA1c level was high, at 10.7%. (R. 257.) However, by February 23, 2010, Dr. Armenti-Kapros observed that Plaintiff's blood sugar levels were already "much better." (R. at 272.) The following month, Dr. Mansouri noted that Plaintiff was "doing well." (R. at 316, 318.) On April 9, 2010, Plaintiff sought treatment from Dr. Tabassian, who diagnosed Plaintiff with vitreous hemorrhage, proliferative diabetic retinopathy, pseudophakia and primary open angle glaucoma in the right eye, and proliferative diabetic retinopathy, pseudophakia and primary open angle glaucoma in the left eye. (R. at 305.) Plaintiff subsequently described his right eye vision as slightly better and Dr. Tabassian noted that the quality of Plaintiff's right eye had improved. (R. at 291.) Plaintiff's progress was confirmed by a visual acuity examination that showed that Plaintiff's right eye had improved to 20/50-1 and his left eye remained at 20/20-1. (R. at 292.)

On April 20, 2010, Plaintiff's HgA1c level was 6.3%. (R. at 254.) Dr. Armenti-Kapros described Plaintiff's blood sugar as "excellent" and noted that Plaintiff was "at [the] goal." (R. at 254, 270.) Plaintiff's HgA1c levels continued to remain stable and was 6.0% on July 13, 2010. (R. at 252.) Plaintiff also continued to see Dr. Tabassian, who noted that by August 2010, Plaintiff's vitreous hemorrhage had settled and his right eye was doing well. (R. at 295.) Similarly, Dr. Mansouri found that Plaintiff's hemiretinal vein occlusion in the right eye remained stable. (R. at 311.) On October 12, 2010, Dr. Armenti-Kapros described Plaintiff's

17

HgA1c level of 6.0% as "excellent" and observed that his blood sugar level remained the same since July 13, 2010. (R. at 352, 366.)

In February 2011, Dr. Mansouri noted that Plaintiff's open angle glaucoma and intraocular pressure were doing better and continued to be stable. (R. at 377-78, 381, 397-99.) Throughout 2011, Dr. Armenti-Kapros found that Plaintiff's HgA1c levels remained stable and controlled. (R. at 410, 417.) Similarly, Dr. Tabassian performed several eye examinations that yielded normal results. (R. at 390, 394-96.)

Plaintiff's own statements further support the ALJ's determination. Plaintiff testified that he had good visual acuity, but experienced problems with his peripheral vision. (R. at 38.) He typically gave himself four insulin shots per day, but his blood pressure normally returned to approximately 120 after breakfast. (R. at 41.) Plaintiff reported that he drove, usually to his congregation meetings about fifteen miles each way. (R. at 42.) Plaintiff stated that he sometimes felt off-balance, but could still mow the lawn and navigate stairs and curbs. (R. at 44-45.) Additionally, Plaintiff used drops for both eyes and wore glasses. (R. 37, 43.) Plaintiff stated that he could see and read better with his glasses. (R. at 44.) Plaintiff also testified that he wanted to stay at his job and work, but was limited because of his vision. (R. at 46.) Plaintiff also indicated that he had not considered other work that he could perform:

> Plaintiff: I didn't really want to leave my job. You know, driving a school bus has been, you know, a lifelong thing for me.
> ALJ: Yeah.
> Plaintiff: If I could work, I would rather go on doing what I was doing.
> ALJ: Well, but I think we know you're not – that's going to be pretty dangerous. Dr. Mansouri certainly thinks so.
> Plaintiff: Yeah. Well, I won't be able to do it. I know I won't be able to go back to it.
> ALJ: So my question is, have you thought about something else?
> Plaintiff: I don't know what else I could do.

(R. at 46.)  Therefore, the ALJ addressed all of Plaintiff's non-exertional limitations in Plaintiff's RFC and did not err in finding that Plaintiff could perform medium work with certain nonexertional limitations.

      C.  The ALJ did not err in applying the Grids.

      Plaintiff argues that the ALJ erred in determining that Plaintiff could perform work that existed in the national economy, based on the application of the Grids.  (Pl.'s Mem. at 7-11.) Specifically, Plaintiff argues that because his nonexertional limitations erode the occupational base, the ALJ misapplied Grid Rule 203.07, which concluded that Plaintiff was not disabled, and that the ALJ should have relied on Grid Rule 202.06, which would have concluded that Plaintiff was disabled.  (Pl.'s Mem. at 8-9.)  Defendant maintains that substantial evidence supports the ALJ's decision that Plaintiff could perform other work that existed in significant numbers. (Def.'s Mem. at 9-12.)

      At step five, the Commissioner must determine whether jobs exist in the national economy in significant numbers that Plaintiff could perform.  Once an ALJ determines a claimant's RFC, he may use the Grids to decide the claimant's level of disability and potential for employment.  Utilization of the Grids is predicated on the claimant suffering from exertional limitations.  20 C.F.R. § 404.1569a; *see* 20 C.F.R. Part 404, Subpart P, Appendix 2, Table 1, § 200.01(e)(1) ("The rules do not direct factual conclusions of disabled or not disabled for individuals with solely nonexertional types of impairments.")  When a claimant suffers from solely nonexertional limitations, the Grids are not conclusive and may be used only as a guide. *Grant v. Schweiker*, 699 F.2d 189, 191-92 (4th Cir. 1983).  The ALJ must inquire whether the nonexertional condition affects the claimant's RFC to perform work of which the claimant is exertionally capable.  *Id.* "[I]f the claimant's nonexertional impairments limit the range of jobs

19

available to a person with the claimant's exertional capabilities, then the Commissioner must

produce a vocational expert to testify that the particular claimant retains the ability to perform

specific jobs which exist in the national economy." *Adkins v. Astrue*, 2011 WL 652508, at *3

(E.D. Va. Feb. 10, 2011) (quoting *Grant*, 699 F.2d at 191-92) (internal quotations omitted).

    As discussed above, the ALJ determined that Plaintiff could perform work at the medium

exertional level with nonexertional limitations. (R. at 24.) The ALJ consulted Grid 203.07,

because the ALJ determined that Plaintiff could perform work at the medium exertional level.

(R. at 27.) Given that Plaintiff experienced nonexertional limitations, the Grids were not

conclusive. *Grant*, F.2d at 192. Because the Grids were not conclusive, the ALJ then properly

employed the use of the VE to consider Plaintiff's additional nonexertional limitations to

determine the extent to which they limited the occupational base of medium work. *Walker*, 889

F.2d at 49-50; *Negrete v. Astrue*, 2008 WL 5381347 (E.D.Va. Dec. 23, 2008); SSR 83-14

(explaining that when evaluating the effect of a nonexertional limitation, "use of a vocational

resource may be helpful" and that the VE may testify for this purpose at the hearing).

    Specifically, the ALJ found that Plaintiff had the nonexertional limitations of restricted

vision and diabetes that precluded him from working near dangerous machinery and heights or

performing work that required very, very fine visual inspection. (R. at 24.) As noted above,

substantial evidence supports the ALJ's RFC determination. During the hearing, the VE testified

that Plaintiff could perform medium, unskilled work, because it generally did not require very

fine visual inspection. (R. at 57.) Further, jobs existed in significant numbers in the national and

local economies for an individual with the nonexertional limitations described by the ALJ. (R. at

59-60, 67-68.) The VE opined that Plaintiff could perform unskilled work as a housekeeper in a

private home, with 70,000 jobs nationally and 400 jobs in Virginia; as a counter-supply person,

with 80,000 jobs nationally and 1,100 jobs in Virginia; and, as a hand packager, with 45,000 jobs

nationally and 750 jobs in Virginia. (R. at 59-60, 67-68.) The VE identified a total of 195,000

jobs that existed in the national economy and 2,250 in Virginia that Plaintiff could perform.

Thus, Plaintiff's assertion that jobs that Plaintiff could perform did not exist in significant

numbers in the national or local economies is unfounded. *Hicks v. Califano*, 600 F.2d 1048,

1051 n.2 (4th Cir. 1979) (stating that 110 jobs within regional economy constituted a significant

number); *see also Parsons v. Shalala*, 33 F.3d 52, 53 (4th Cir. 1994) (citing *Barker v. Sec'y of

Health and Human Serv.*, 882 F.2d 1474, 1478-79 (9th Cir. 1989) (finding 1,266 jobs in the local

economy significant)). Therefore, the ALJ did not err in his determination that Plaintiff could

perform jobs existing in the national and local economies.

Plaintiff further argues that the ALJ should have applied Grid Rule 202.06 rather than

Grid 203.07. (Pl.'s Mem. at 8-9.) Plaintiff contends that use of Grid 202.06 would have resulted

in a finding of disability. (Pl.'s Mem. at 8-9.) Defendant responds that the ALJ utilized the

proper grid and that substantial evidence supports the ALJ's decision that Plaintiff could perform

other work that existed in significant numbers. (Def.'s Mem. at 9-13.)

As previously discussed, after the ALJ determines a claimant's RFC, he may use the

Grids to determine the claimant's level of disability and potential for employment. The Grids

only consider the claimant's exertional impairments. *Grant*, 699 F.2d at 192 ("Each grid table,

however, only considers the strength or exertional component of the claimant's disability in

determining whether jobs exist that the claimant is able to perform in spite of his disability"); 20

C.F.R. § 404.1569a; 20 C.F.R. Part 404, Subpart P, Appendix 2, Table 1, § 200.01(e)(1). Where

a claimant suffers from both exertional and nonexertional limitations, the Grids are not

conclusive and require individual consideration. *Grant*, 699 F.2d at 192. The ALJ must then

21

conclude whether the claimant's nonexertional impairments affect RFC determination. *Id.* Where the claimant's nonexertional limitations reduce the occupational base available to a person with the claimant's exertional capabilities, the ALJ must employ a VE to testify whether the claimant maintains the ability to perform work existing in the national economy. *Id.* at 191-92.

Here, the ALJ found that Plaintiff maintained the ability to perform work at the medium exertional level with nonexertional limitations. (R. at 24.) The VE then testified that Plaintiff could perform medium, unskilled work, because it generally did not require fine visual acuity. (R. at 57.) As noted above, substantial evidence supports the ALJ's determination that Plaintiff retained the ability to perform work at the medium exertional level with nonexertional limitations. Further, Plaintiff does not challenge this conclusion. (Pl.'s Mem. at 10.) Therefore, the ALJ properly determined that Grid 202.06 did not apply in Plaintiff's case. Grid 202.06 is relied upon where the claimant could only perform work at the light exertional level. 20 C.F.R. Part 404, Subpart P, Appendix 2. For the above-stated reasons, it would be improper to account for Plaintiff's nonexertional limitations when referencing the Grids. *Grant*, 699 F.2d at 191-92. Therefore, the ALJ correctly referred to Grid 203.07 based on Plaintiff's ability to perform some jobs at the medium exertional level, and properly gave particularized consideration through the use of a VE to determine that Plaintiff could perform work that exists in the national economy. (R. at 59-60, 67-68.)

## VI.    CONCLUSION

For the reasons stated above, the Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 11) be DENIED, that Defendant's Motion for Summary Judgment (ECF No. 13) be GRANTED and that the final decision of the Commissioner be AFFIRMED.

Let the Clerk file this Report and Recommendation electronically and forward a copy to the Honorable John A. Gibney, Jr. with notification to all counsel of record.

## NOTICE TO PARTIES

**Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a de novo review of the determinations contained in the report and such failure shall bar you from attacking on appeal the findings and conclusions accepted and adopted by the District Judge except upon grounds of plain error.**

_____ /s/

David J. Novak
United States Magistrate Judge

Richmond, Virginia
Date:  January 13, 2015